**E-Filed 3/11/09**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| STANFORD HOSPITAL AND CLINICS; AND LUCILE PACKARD CHILDREN'S HOSPITAL,<br><br>Petitioners,<br><br>v.<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715,<br><br>Respondent. | Case Numbers C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)<br><br>**ORDER[1] DISMISSING ACTIONS** |
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715,<br><br>Petitioner & Counter-Respondent,<br><br>v.<br><br>STANFORD HOSPITAL AND CLINICS; AND LUCILE PACKARD CHILDREN'S HOSPITAL,<br><br>Respondents & Counter-Petitioners. | |

---

[1] This disposition is not designated for publication in the official reports.

1    Currently before the Court are six related actions arising from labor disputes between the

2    Service Employees International Union ("SEIU"), Local 715 ("Local 715") and two of its

3    members' employers, the Stanford Hospital & Clinics and Lucile Packard Children's Hospital

4    ("the Hospitals"). Four of the actions relate to the Hospitals' allegedly wrongful termination of

5    individual employees. A fifth action arises from the Hospitals' allegedly wrongful withholding

6    of dues from Local 715, and a sixth stems from the Hospitals' alleged failure to pay certain

7    employees a type of additional compensation for special services rendered. In two of the

8    actions–one of the wrongful termination disputes and the special compensation dispute–the

9    relevant grievance already has been arbitrated. In the remaining four actions, Local 715 seeks to

10   compel arbitration pursuant to the parties' now-terminated collective bargaining agreement

11   ("CBA").

12   The Hospitals, seeking to vacate the existing arbitral awards and to preclude further

13   arbitrations, move for summary judgment on the grounds that (1) Local 715 has no standing to

14   compel arbitration or confirm an arbitration award because it does not have a legally cognizable

15   existence, (2) even if Local 715 does exist, it lacks standing because its bargaining authority was

16   terminated when SEIU effectively dissolved it pursuant to a reorganization plan for California

17   locals, (3) again assuming that Local 715 exists, the parties seeking to compel arbitration are not

18   in fact Local 715 but employees of another union acting pursuant to an invalid servicing

19   agreement with Local 715, and (4) the two extant arbitration awards are invalid. As explained

20   in detail below, the Court finds that the Hospitals have carried their Rule 56 burden of showing

21   that Local 715 has ceased to exist, and that Local 715 has not carried its burden of identifying a

22   triable issue of material fact with respect to its legal existence. However, because Local 715

23   does not exist, there is no case or controversy before this Court. Accordingly, rather than

24   granting the Hospitals' motions for summary judgment, the Court will dismiss each of the six

25   actions as moot.

26

27

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

**I. BACKGROUND**

**A.     The Collective Bargaining Agreement**

In 1998, the National Labor Relations Board ("NLRB") certified Local 715 as the "exclusive collective bargaining representative" of a unit of the Hospitals' employees ("the Bargaining Unit").  NLRB Certification, Arnold Decl., Ex. A.  Pursuant to this formal certification, the Hospitals negotiated a succession of collective bargaining agreements with Local 715.  The last operative CBA, the terms of which apply to the instant disputes, became effective on January 20, 2006 and was set to expire on November 4, 2008.  *See* CBA, Arnold Decl., ¶ 4.  Article 1.3.1 of the CBA contains a "Recognition Clause" stating that pursuant to the NLRB's certification, the employer recognizes "[Local 715] as the *sole and exclusive representative for the purpose of collective bargaining*" with respect to Bargaining Unit employees.  CBA, at 1 (emphasis added).  Article 26 contains a grievance and arbitration procedure through which alleged violations of the CBA may be challenged.  CBA, at 62-69.  Article 26.2.1 states that "[Local 715] will have the right to present grievances under this procedure on behalf of an individual employee, on behalf of a group of employees, or on behalf of itself as a Union grievance."  CBA, at 62.  Article 26.2.3.e provides that "only [Local 715] may appeal a grievance to arbitration."  CBA, at 63.

**B.     Local 715**

**1.     The Servicing Agreement with United Healthcare Workers**

While the ultimate issue of Local 715's legal existence is highly disputed, most of the facts underlying that issue are not in dispute.  Thus, it is undisputed that in late February 2006, Kristy Sermersheim, the Executive Secretary of Local 715, executed a three-page Servicing Agreement ("the Servicing Agreement") with the president of another local union known as United Healthcare Workers–West ("UHW").  *See* Arnold Decl., Ex. CC (letter attaching Servicing Agreement)*.* The Servicing Agreement provided that UHW would provide certain "professional services" to Local 715 at no cost, including "[r]epresentation in the grievance procedure and at arbitration hearings," "[r]epresentation at labor-management meetings," and

1  "[a]ssistance to members appearing before the National Labor Relations Board on behalf of the

2  Local 715 Chapter at the Stanford Facility." *Id*.  By its terms, the Servicing Agreement was to

3  become effective as of March 1, 2006.  *Id*.

4        **2.**       **The Role of UHW**

5        On February 28, 2006, Greg Pullman, the Staff Director of Local 715, informed Laurie

6  Quintel, the Hospitals' Director of Employee and Labor Relations, that the settlement of

7  grievances and unfair labor practice charges would be handled by an employee of UHW named

8  Ella Hereth.  Quintel Decl., ¶ 9.  At or about the same time, another UHW representative

9  apparently informed Ms. Quintel that UHW would be taking over representation for the

10  Hospitals.  Quintel Decl., ¶ 10.  When Ms. Quintel sought clarification, Mr. Pullman assured her

11  that "Local 715 represents the workers covered by our agreement" but that "Local 715 has asked

12  SEIU UHW to service this unit in many ways on a day-to-day basis."  Quintel Decl., ¶ 11-12 &

13  Ex. B (attaching correspondence).

14        According to the Hospitals, between March and May of 2006, all functions that

15  previously had been carried out by Local 715 personnel were carried out exclusively by UHW

16  employees.  The Hospitals point to correspondence stating that grievances had been filed "on

17  behalf of SEIU UHW" and referring to Local 715 bargaining unit employees as "members" of

18  UHW.  Quintel Decl., ¶ 15 & Ex. D (letter attaching "a grievance filed on behalf of SEIU-

19  UHW").  During the same period, Ms. Hereth sent a letter to Ms. Quintel instructing her to

20  "direct all SEIU correspondence . . . to . . . Ella Hereth and Rachel Deutsch, SEIU United

21  Healthcare Workers–West."  Quintel Decl., ¶ 14 & Ex. C.  On May 22, 2006, another UHW

22  employee informed the Hospitals that "[she] and Ella Hereth do not work for SEIU 715.

23  SEIU-UHW is doing the representation work here at Stanford Hospital."  Quintel Decl., ¶ 20 &

24  Ex. H.  On the same day, Mr. Pullman stated in an e-mail that three UHW representatives based

25  in San Francisco were "handling all representation matters for SEIU Local 715."  Quintel Decl.,

26  ¶ 20 & Ex. H.

27        On May 26, 2006, Ms. Quintel received an email from a representative of UHW who

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-
1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1    claimed to have authority to accept changes to the parties' CBA.  Quintel Decl., ¶ 21 & Ex. I.

2    On March 28, 2006, W. Daniel Boone of the law firm Weinberg Roger & Rosenfeld, which

3    historically had acted as counsel for Local 715, wrote a letter to Laurence R. Arnold, an attorney

4    with the law firm of Foley & Lardner LLP representing the Hospitals, regarding a pending

5    grievance.  In the subject line of his letter, Mr. Boone referred to "United Healthcare Workers –

6    West (formerly SEIU, Local 715)."  Arnold Decl., ¶ 26 & Ex. S.  Although Mr. Boone, in a

7    subsequent letter, characterized his reference to the "former" Local 715 as an error, that

8    subsequent letter contained the same "error."  Arnold Decl., ¶ 25-28 & Exs. R-W.  Separately,

9    Ms. Quintel states that in early April 2006, she received a telephone call from a UHW employee

10   who stated that when the Hospitals remitted union dues, they needed to provide the Social

11   Security Numbers of the relevant employees to help UHW identify them.  Quintel Decl., ¶ 16.

12   **3.      Hospitals' rejection of UHW as Local 715's agent**

13           In May of 2006, the Hospitals declared that they no longer would deal with employees of

14   UHW because of what they considered mounting evidence that UHW was not providing limited

15   "professional services" but actually was assuming all of Local 715's core functions.  The

16   Hospitals announced that they did not consent to any transfer of bargaining rights from Local

17   715 to UHW.  Quintel Decl., ¶ 19 & Ex. G; Arnold Decl., ¶ 32 & Ex. Z.  In June, 2006, the

18   Hospitals also requested information from Local 715 regarding the organization's current status

19   and the role of UHW, given what they considered indications that Local 715 had abandoned or

20   was abandoning its status as the certified bargaining representative.  Arnold Decl., ¶ 32 & Ex. Z.

21           In response to further requests for documentation with respect to the status of Local 715

22   and its relationship with UHW, the Hospitals received a copy of the Servicing Agreement in

23   mid-August 2006.  Quintel Decl., ¶ 24-25 & Ex. L; Arnold Decl., ¶ 36-38 & Ex. CC-EE.

24   According to the Hospitals, the Servicing Agreement did not accurately reflect the relationship

25   between Local 715 and UHW, in that Local 715 purportedly had abdicated all of its

26   responsibilities and assigned them to UHW in accordance with a reorganization plan designed

27   by SEIU and described below.  Thus, in a letter dated August 29, 2006 and addressed to Ms.

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1    Sermersheim, the Executive Secretary of Local 715, Mr. Arnold stated that the Hospitals did not

2    recognize the Servicing Agreement and would not deal with employees of UHW acting pursuant

3    to the Agreement.  Arnold Decl., ¶ 38 & Ex. EE.

4            **4.      The SEIU reorganization plan**

5            On June 9, 2006, SEIU issued a report outlining a plan to reorganize various SEIU

6    Locals (the "SEIU Reorganization Plan").  The report noted that "Local 715 is the certified

7    representative of employees at Stanford and Lucille [sic] Packard Hospitals" but that "UHW is

8    actually servicing employees in these facilities . . . pursuant to servicing agreements."  SEIU,

9    Hearing Officers' Joint Report and Recommendations, Inciardi Decl., Ex. T, at 16.  Consistent

10   with jurisdictional changes outlined in the report and designed to provide greater union strength,

11   the report concluded that "the affiliation of private healthcare units represented by Locals 727,

12   715, and 2028 should be changed to UHW as soon as feasible."  *Id*. at 65.  Shortly after issuance

13   of the report, SEIU's International President announced that the report would be adopted, and

14   confirmed that "Private Sector Hospital units currently represented by Locals 535, 707, 715,

15   2028, and 4988 will merge into UHW."  SEIU, Memorandum Re. IEB Decision on California

16   Jurisdiction, dated June 11, 2006, Quintel Decl., ¶ 23 & Ex. K, at 4.

17           **5.      Reorganization and merger**

18           On January 2, 2007, SEIU's International President issued an "Order Of Reorganization"

19   to various SEIU locals, including Local 715, directing that "all . . . Stanford/Lucille [sic]

20   Packard Hospital workers be, *and are hereby*, reorganized into SEIU Local UHW."  Order of

21   Reorganization, dated January 2, 2007, Inciardi Decl., Ex. U (emphasis added).  The Order was

22   "effective January 2, 2007, or as soon thereafter as practicable."  *Id*.  On January 31, 2007, Ms.

23   Quintel was copied on an email from Robert W. Rutledge, Chief Steward for the hospital

24   workers' Bargaining Unit, to Valerie Jeffries, Senior Employee and Labor Relations Specialist

25   for UHW, in which Mr. Rutledge stated that "SEIU 715 no longer exists and a service

26   agreement between the former 715 and UHW has been in place since March first of 2006."

27   Quintel Decl., ¶ 28 & Ex. O.  Although several purported agents of Local 715 under the

28

                                                    6
Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-
1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1    Servicing Agreement were copied on the email, Ms. Quintel is not aware of any response to Mr.

2    Rutledge's assertion that Local 715 no longer existed.  *See* Quintel Decl., ¶ 28.  According to

3    Ms. Quintel, Mr. Rutledge repeated his assertion that Local 715 no longer existed at a meeting

4    with Ms. Quintel on or about February 2, 2007.  Quintel Decl., ¶ 29.  In that meeting, Mr.

5    Rutledge also apparently stated that Local 715 no longer represented the Hospitals' employees,

6    who in fact were represented by UHW.  Quintel Decl., ¶ 29.

7         Ms. Quintel also monitored Local 715's website, which by late January 2007 contained

8    the following notice: "We are in the process of transitioning to our new local 521.  This web site

9    will be taken down on Feb. 28.  On March 1, our new Local's web site www.seiu521.org will

10   have your chapter pages and other information."  Quintel Decl., ¶ 30 & Ex. P (collecting website

11   screen captures).  By March 1, 2007, visitors to Local 715's website automatically were

12   redirected to the website of Local 521.  The Local 521 website stated that five local unions,

13   including Local 715 "have come together . . . by forming one larger, more powerful local."

14   Quintel Decl., ¶ 32 & Ex. R.  On the website, Local 715 was referred to consistently as "*former*

15   Local 715."  Quintel Decl., ¶ 32 & Ex. R (attaching website screen captures) (emphasis added).

16   On March 5, the website contained the following statement: "Five locals (415, 535, 700, 715,

17   and 817) have come together to cover the North Central region by forming one larger, more

18   powerful local.  On January 2, 2007, our new local received its charter.  On March 1, 2007, the

19   resources of all five locals were transferred to Local 521."  Quintel Decl., ¶ 40 & Ex. X.  On

20   March 2, 2007, Ms. Quintel performed a search for "Stanford University Medical Center" on the

21   UHW Website (http://SEIU-UHW.org), which returned a listing indicating that UHW

22   represented the Hospitals.  Quintel Decl., ¶ 34 & Ex. S.

23        **6.    Hospitals' decision to cease remitting dues to Local 715**

24        While Local 715's purported representatives continued to assert that the union still

25   existed and had undergone no changes, Quintel Decl., ¶ 39 & Ex. W, the Hospitals claim to have

26   been convinced that Local 715 had ceased to exist not later than March 1, 2007.  Because the

27   CBA required the Hospitals to deduct union dues from Bargaining Unit employees' paychecks

28

7

and remit them to Local 715, and because the dues deduction authorization forms required

remittance specifically to Local 715 and to no other organization, Quintel Decl., ¶ 35 & Ex. T

(attaching dues remittance form), the Hospitals determined that they no longer could remit dues

that were being diverted to UHW.  Accordingly, on March 2, 2007, Ms. Quintel sent a letter to

Ms. Sermersheim stating that after the remittance of the dues for February 2007, the Hospitals

no longer would remit dues to Local 715 absent clarification of the local's status and the identity

of the organization that would be receiving the dues.  *See* Letter from Laurie Quintel to Kristy

Sermersheim, Quintel Decl., Ex. U.  According to the Hospitals, such information was never

provided; as a result, after March 1, 2007, the Hospitals ceased remitting dues. Quintel Decl., ¶

37.  The Hospitals continued to deduct dues from Bargaining Unit employees' paychecks but

held the dues in a separate bank account established for that purpose.  The Hospitals have

continued to follow this procedure.  Quintel Decl., ¶ 37.

### 7.  Imposition of trusteeship on Local 715

On June 8, 2007, SEIU's International President issued an "Order Of Emergency

Trusteeship."  The Order stated that because of the Hospitals' contention that Local 715 no

longer existed, and because of the transfer of "most" of Local 715's members and resources to

Local 521, SEIU was placing Local 715 under trusteeship, removing its officers, and appointing

Bruce W. "Rusty" Smith as trustee.  Order of Emergency Trusteeship, dated June 8, 2007,

Inciardi Decl., Ex. Z.  The order confirmed that SEIU's Reorganization Plan remained in place

and that the remaining members of Local 715 would be "united with other SEIU healthcare

members in SEIU United Healthcare Workers–West."  *Id*.  The trustee confirmed that the

Servicing Agreement would "remain in full force and effect," and that UHW employees would

continue to service the Hospitals.  *See* Facsimile from Rusty Smith to Laurie Quintel, dated June

14, 2007, Quintel Decl., Ex. FF.

### 8.  Legal representation of Local 715

In June 2007, the trustee of Local 715 retained the law firm of Altshuler Berzon LLP.

Nonetheless, attorneys from the Weinberg firm continued to act "on behalf" of Local 715 in an

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

undisclosed capacity, without clarifying whether the Altshuler firm actually represented Local

715.  Quintel Decl., ¶ 57; Arnold Decl., ¶¶ 40, 49, 55, 65 & Exs. UU & EEE.  Attorneys from

the Weinberg firm have appeared in each arbitration hearing that has been held since the

appointment of the Altshuler Firm as counsel.  In light of the Weinberg firm's historic

representation of UHW and past indications in correspondence with the Hospitals that it was

representing UHW pursuant to the Servicing Agreement, Quintel Decl., ¶ 17 & Ex. E, the

Hospitals "grew concerned" that attorneys from the Weinberg firm were acting not on behalf of

Local 715 directly but under authority of the Servicing Agreement, which the Hospitals had

rejected.  The Hospitals therefore requested on multiple occasions that either the Weinberg firm

or the trustee clarify whether the firm was representing Local 715 directly or pursuant to the

Servicing Agreement.  Arnold Decl., ¶ 49 & Ex. NN.  These requests were met with silence or

refusal to provide the requested information.  Arnold Decl., ¶ 50-53 & Ex. OO-RR (attaching

correspondence).

  To ascertain more directly whether Local 715 continued to exist, the Hospitals made a

formal request for information regarding Local 715's status pursuant to the National Labor

Relations Act ("NLRA").  When the Hospitals received no information, they filed unfair labor

practice charges against Local 715 for withholding the information and, on July 28, 2008,

declared that they no longer would recognize Local 715.  On August 4, 2008, an administrative

law judge assigned to hear the Hospitals' petition found that the information the Hospitals

sought was relevant to their obligation to bargain with Local 715 or its purported agents, and

that Local 715 had committed an unfair labor practice by withholding the requested information.

**C.    The Grievances**

  The first of the six grievances now at issue was filed on April 25, 2006.  In that

grievance, Local 715 alleged that the Hospitals violated Article 9 of the CBA by refusing to

provide so-called "RHC pay"[2] to certain employees who carried a cell phone-like device called a

---

[2] RHC pay is a premium added to an employee's normal compensation where the
employee performs functions associated with a higher-graded position or a "Lead" position.

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-
1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1    "Spectralink."  Quintel Decl., ¶¶ 4-5; Arnold Decl., Ex. E (attaching grievance form).  Unable to

2    resolve the Grievance, the parties submitted it to arbitrator Paul D. Staudohar.  Arnold Decl., ¶

3    12.  A hearing was held before the arbitrator on April 26, 2007 in Palo Alto, California, and an

4    award in favor of the employees issued on July 2, 2007.  Arnold Decl., ¶ 13 & Ex. L.

5            Four additional grievances were filed in March and May of 2007.  Quintel Decl., ¶¶ 62,

6    66 & 70 & Exs. QQ, TT, &WW.  The Simien Grievance, filed on March 29, 2007, alleged that

7    the Hospitals violated the CBA by giving employee Simien a warning and forcing him to change

8    his shift.  Quintel Decl., ¶ 66 & Ex. TT (attaching grievance form).  The Satuito, Acosta, and

9    Andrade Grievances, filed on March 6, March 14, and May 22, 2007, respectively, alleged that

10   the Hospitals' termination of those employees violated the CBA.  Quintel Decl., ¶¶ 62 & 70 &

11   Exs., QQ, RR & WW (attaching grievance forms).  The Hospitals denied each grievance.

12   Quintel Decl., ¶¶ 63, 67 & 71.  Representatives from the Weinberg firm contacted the Hospitals

13   seeking to arbitrate the matters.  Arnold Decl., ¶ 55 & Ex. UU.  However, by this time, the

14   Hospitals believed that Local 715 "had effectively ceased to exist and/or that the Weinberg

15   attorneys seeking to arbitrate the matter were actually acting on behalf of UHW."  Accordingly,

16   while the Hospitals appeared for arbitration of the Acosta Grievance, they refused to proceed

17   without an assurance from the Weinberg attorneys that they were representing Local 715 directly

18   and not pursuant to the Servicing Agreement.  When the Weinberg attorneys refused to give

19   such an assurance, the Hospitals left the arbitration and subsequently refused to arbitrate the

20   remaining disputes.  The arbitrator in the Acosta matter conducted an ex parte proceeding and

21   issued a judgment in Acosta's favor.

22          The sixth grievance was filed on May 22, 2007.  That grievance alleged that the

23   Hospitals' refusal to remit dues to Local 715 violated the CBA.  Quintel Decl., ¶ 68 & Ex. UU.

24   On May 30, 2007, Ms. Quintel faxed a letter to Chief Steward Jesus Andrade, informing him

25   that the Hospitals were refusing to process the grievance in light of Local 715's "evident

26   dissolution."  Quintel Decl., ¶ 69 & Ex. VV.  A petition to compel arbitration was filed on

27   January 11, 2008.

28
                                              10
     Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-
     1727 JF (RS)
     ORDER DISMISSING ACTIONS
     (JFLC3)

1

### III. DISCUSSION

2

**A.    The NLRB's Primary Jurisdiction**

3     The Court's first task is to determine whether any of the issues raised by the instant

4    actions implicate the so-called "primary jurisdiction" of the NLRB.  "The doctrine of primary

5    jurisdiction is a recognition of congressional intent to have matters of national labor policy

6    decided in the first instance by the National Labor Relations Board."  *United Ass'n of*

7    *Journeymen v. Valley Eng'rs*, 975 F.2d 611, 613 (9th Cir. 1992) (quoting *Glaziers &*

8    *Glassworkers Local Union No. 767 v. Custom Auto Glass Distribs.*, 689 F.2d 1339, 1342 (9th

9    Cir. 1982)).  Issues falling within the NLRB's primary jurisdiction include designation of an

10   exclusive bargaining agent and identification of an appropriate collective bargaining unit under

11   § 9 of the Labor Relations Management Act.  *See Local No. 3-193 Int'l Woodworkers v.*

12   *Ketchikan Pulp Co.*, 611 F.2d 1295, 1298 (9th Cir. 1980).  Such "representational issues" are

13   "more appropriately resolved by the NLRB" than by the courts, *Hotel Employees, Restaurant*

14   *Employees Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1468 (9th Cir. 1992), given the

15   agency's "superior expertise." *Valley Eng'rs*, 975 F.2d at 613.

16    Nonetheless, "[a] case does not fall on the NLRB's primary jurisdiction side of the

17   jurisdictional line merely by having 'representational' overtones."  *Service Employees Int'l*

18   *Union v. St. Vincent Med. Center*, 344 F.3d 977, 984 (9th Cir. 2003).  In addition, "the doctrine

19   of primary jurisdiction does not apply in determining a union's past representational status."

20   *United Bhd. of Carpenters v. Endicott Enters. Inc.*, 806 F.2d 918, 921 (9th Cir. 1986), *overruled*

21   *prospectively on other grounds by Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of*

22   *Laborers*, 861 F.2d 1124 (9th Cir. 1988) (en banc), *and* 895 F.2d 516 (9th Cir. 1990).  Thus,

23   where parties seek to establish rights under agreements that were operative in the past, and "do

24   not seek any determination with regard to what now constitutes an appropriate bargaining unit or

25   with regard to whether any union now represents any . . . employee[,] . . . the district court ha[s]

26   jurisdiction to hear th[e] case." *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1157 (9th

27   Cir. 2000).

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1    As will become clear in the discussion that follows, in order to decide whether Local 715

2    is an extant labor organization, such that it may request confirmation of arbitration awards or

3    seek to compel arbitration of disputes, the Court need only determine whether Local 715 has any

4    members and performs any representational functions.  It need not determine whether Local 715

5    is a proper bargaining authority for any particular bargaining unit.  In addition, to determine

6    whether Local 715 has standing to compel arbitration of the disputes in question, the Court need

7    only determine whether Local 715 remained in continuous existence throughout the period in

8    which the allegedly unlawful conduct occurred.  That is a question of "past representational

9    status" which this Court properly may determine.

10   **B.     Status of Local 715**

11          **1. Existence for purposes of standing**

12          The Hospitals rely on all of the testimonial and documentary evidence previously

13   discussed to establish that Local 715 no longer exists.  Specifically, the Hospitals refer to the

14   repeated assertions by persons associated with Local 715 that the local had ceased to exist, to

15   similar assertions that UHW was performing all representational functions formerly performed

16   by Local 715, and to the fact that SEIU intended to and to all appearances did merge Local 715

17   into UHW.  In addition, the Hospitals provide competent evidence that as of June 8, 2007, Local

18   715 had no employees, Sermersheim Depo., Ridley Decl., Ex. F, 93:19-95:17; Smith Depo.,

19   Ridley Decl., Ex. G, 119:16-25; 297:14-24, virtually no records, *see* Escamilla Depo., Ridley

20   Decl., Ex. D, 43:2-15; Smith Depo., 74:13-15; 77:19-81:11, no members, Sermersheim Depo.,

21   59:1-6, and no assets except for a "terminal rainy day fund" that would be transferred to Local

22   521, Smith Depo., 346:22-348:10.  In addition, testimonial evidence indicates that Local 715 has

23   not paid the fees of any of the attorneys who purport to represent it, Smith Depo., 233:15-

24   234:15, and that dues received by Local 715 have been delivered to other organizations,

25   Sermersheim Depo., 118:13-119:22; 177:18-178:4; Smith Depo., 202:20-205:7; 310:18-311:18;

26   313:2-316:2.  Finally, the organization's trustee has performed no duties for Local 715 on his

27   own and has stated that the "objective of the trusteeship was to have the [Stanford] Unit

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1    represented by UHW."  Smith Depo., 231:7-13.

2         On the basis of this extensive evidence–both documentary and testimonial, and both

3    anecdotal and structural–the Court finds that the Hospitals have met their initial burden to show

4    the lack of a triable issue of fact with respect to the purported non-existence of Local 715.  To

5    establish that it does exist, Local 715 asserts only that (1) the Hospitals "understood" Local 715

6    to exist, (2) the Hospitals continued until July 28, 2008 to deal with employees who, prior to

7    March 1, 2007, had been designated as Local 715 shop stewards, and (3) Local 715, through its

8    trustee, continues to represent employees of Stanford University and Santa Clara University.  In

9    support of its contention that the Hospitals "understood" it to exist after March 1, 2007, Local

10   715 first refers to a federal court action filed in August 2006.  However, because that action was

11   filed considerably before the date on which Local 715 allegedly became defunct, and because it

12   relates to conduct occurring exclusively in the summer of 2006, the action has no bearing on the

13   instant case.  Local 715 next cites the claim of unfair labor practices that the Hospitals filed

14   before the NLRB, arguing that the filing of the claim shows the Hospitals' recognition that

15   Local 715 continued to exist.  But the sole purpose of that claim, as discussed above, was to

16   compel Local 715 to provide information about whether it *did* or *did not* exist.  Indeed, the ALJ

17   concluded that Local 715's refusal to provide such information constituted an unfair labor

18   practice.

19        Local 715 also points to an allegation made in the Hospitals' petition dated October 9,

20   2007 to vacate the arbitral award in the Anesthesia Techs case.  In the petition, the Hospitals

21   alleged that Local 715 was a "labor organization."  However, between March 1, 2007 and the

22   date on which the petition was (and had to be) filed, Local 715 consistently refused to provide

23   the Hospitals with information concerning its status.  *See* Quintel Decl., ¶¶ 36, 39, 41-44, 46-47

24   & Exs. U, W, Y, BB, DD, EE; Arnold Decl., ¶¶ 41-42, 48-54 & Exs. GG, MM-TT; Ridley

25   Decl., Ex. B.  Because Local 715 refused to clarify its status in a manner that would have

26   permitted the Hospitals accurately to state their position, the Hospitals were not required to elect

27   between having "to forego a potential claim [or] run[ning] the risk of having such a claim used

28

                                        13
Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1   as an admission." *Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1434 (10th Cir. 1990)

2   (citation omitted).  Accordingly, the Court attaches no legal significance to the allegation in the

3   October 9, 2007 petition.

4            Local 715 next argues that its existence is demonstrated by the Hospitals' purported

5   dealing with Local 715 shop stewards after March 1, 2007.  Specifically, Local 715 states that

6   "[a]fter March 1, 2007 and until July 28, 2008, there existed a Shop Steward structure,

7   consisting of 25 Shop Stewards; the Shop Stewards were responsible for representing their

8   fellow workers and sought to enforce and protect their rights under their collective bargaining

9   agreement."  Local 715's Opp. to MSJ, Case No. C 08-213 JF, at 8:10-13.  The only direct

10  evidence of this claim lies in (1) several vague and conclusory statements in the deposition of

11  Myriam Escamilla, a UHW employee purportedly acting on behalf of Local 715, and (2) the

12  declaration and attached correspondence of Linda Cornell, an employee of the Hospitals who

13  purports to have acted as a representative of Local 715 until its decertification in July 2008.

14           The fact that the Hospitals interacted with their employees, some of whom claimed to be

15  associated with Local 715, does not establish that Local 715 continued to exist.  As an initial

16  matter, one of the purported Local 715 employees with whom the Hospitals dealt–in fact, the

17  local's former Chief Shop Steward–stated on two occasions that Local 715 did not exist.  *See*

18  Email from Robert Rutledge, Chief Shop Steward of Local 715, to Valerie Jeffries, Quintel

19  Decl., Ex. O ("SEIU 715 no longer exists and a service agreement between the former 715 and

20  UHW has been in place since March first of 2006."); *see also* Quintel Decl., ¶ 29.  A second

21  such employee stated categorically that UHW was representing the Hospital employees'

22  bargaining unit.  *See* Statement of Chuck Fonseca, former executive board member of Local

23  715, at Palo Alto City Council Meeting, Quintel Decl., Ex. NN, at 36-38 (stating that the

24  "Stanford Lucile Packard Hospital employees [are] represented by UHW").

25           More importantly, the primary evidence offered to show dealings between the Hospitals

26  and the purported Local 715 fails to accomplish its purpose.  The evidence consists of the

27  declaration of Linda Cornell, who claims to have been an assistant shop steward in the

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1   organization.  Ms. Cornell states with distinct ambiguity that "[p]rior to" September 2008, she

2   "actively participated as a member in SEIU Local 715 since 1998."  Cornell Decl., ¶ 2.  While

3   Ms. Cornell asserts repeatedly that she corresponded and otherwise dealt with the Hospitals in

4   her capacity as assistant shop steward of Local 715 on a variety of occasions, each such

5   interaction occurred well after March 1, 2007, the latest date on which Local 715 could have

6   ceased to exist as a separate and distinct entity, and also after June 8, 2007, when a trusteeship

7   was placed over whatever remained of Local 715.  *See* Cornell Decl., ¶¶ 3-20.  In addition, Ms.

8   Cornell makes no mention of any interaction with any other entity or person purporting to

9   represent Local 715.  *Id.*

10      As is readily apparent, Ms. Cornell's account of the status of Local 715 is inconsistent

11  with the record, as set forth above.  *See, e.g.*, Sermersheim Depo., Ridley Decl., Ex. F, 93:19-

12  95:17 & Smith Depo., Ex. G; 119:16-25; 297:14-24 (confirming that Local 715 had no

13  employees after June 8, 2007); Sermersheim Depo., 59:1-6 (confirming that all members of

14  Local 715 were transferred to other unions).  Yet her account is fully consistent with the

15  Hospitals' explanation of these interactions.  Faced with the apparent dissolution of Local

16  715–the only collective bargaining agent with which the Hospitals legally could deal–the

17  Hospitals continued to deal with persons who previously had been recognized as legitimate

18  agents of Local 715.  The Hospitals did so without conceding that Local 715 actually existed.

19  Given their contractual obligation to bargain with Local 715 and their simultaneous doubt as to

20  whether Local 715 continued to exist, the Hospitals' interaction with purported employees of

21  Local 715 was no more than a prudent course designed to preserve the Hospitals' legal rights.

22      Local 715's final attempt to demonstrate its continued existence rests on the claim that,

23  while it no longer services workers at the Hospitals, it has active members at Santa Clara

24  University and Stanford University.  This claim, however, rests entirely on two conclusory

25  sentences in the declarations of the appointed trustee of Local 715.  *See* Smith Decl., ¶ 3; Supp.

26  Smith Decl., ¶ 5.  "Conclusory allegations . . . without factual support, are insufficient to defeat

27  summary judgment."  *National Steel Corporation v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1  (9th Cir. 1997).  Where, as here, "the moving party has carried its burden under Rule 56(c), its

2  opponent must do more than simply show that there is some metaphysical doubt as to the

3  material facts."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

4  (1986).  In the face of the evidence provided by the Hospitals, which includes both written

5  documentation and a significant number of admissions by those associated with or claiming to

6  act on behalf of Local 715, the unsupported assertion that Local 715 has members is insufficient

7  to create a genuine issue of fact.  Indeed, in light of the trustee's own testimony that Local 715

8  has no employees, retains no assets used for representational purposes, and receives no dues, *see*

9  Smith Depo., 119:16-25; 198:1-199:25; 202:20-205:7; 297:14-24; 346:6-348:6, it is difficult to

10  imagine how Local 715 could be carrying out representational functions with respect to the

11  purported members.

12      Local 715 relies heavily on the breadth of the statutory definition of "labor

13  organizations"[3] and refers in particular to the Eighth Circuit's decision in *N.L.R.B. v. Blanton*

14  *Company*, 121 F.2d 564 (8th Cir. 1941).  In *Blanton*, the defendant company argued that its

15  collective bargaining obligations were at an end because the union no longer existed.  In support

16  of this argument, the company submitted evidence showing that the union "had become more or

17  less inactive," that the company "had been able to obtain cards signed by almost all of the

18  employees that they were desirous of conducting their labor relations with the management,"

19  and that the president of the union "attempt[ed] . . . to declare that 'there is no C.I.O. union.'"

20  *Id*. at 568-69.  The court rejected the employer's contentions, noting that the cessation of union

21  activities was incomplete, that some of the union's members did not agree to a transfer of

22  representation, and that the union had not been dissolved formally.  Most importantly, the court

23  was convinced by the record "that the dazed condition of the union had been occasioned by the

24

25      [3] The National Labor Relations Act defines a labor organization as "any organization of
26  any kind, or any agency or employee representation committee or plan, in which employees
    participate and which exists for the purpose, in whole or in part, of dealing with employers
27  concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of
    work."  29 U.S.C. § 152(5).
28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

persistent undermining efforts of the employer," *id*. at 569, which "definitely sought to prevent

unionization of the plant, and . . . so maneuvered the situation that the efforts at

self-organization finally were frustrated," *id*. at 571.  As a result, "[a]ny change in [the union's]

status from such a cause was not one" that justified non-recognition by the company.  *Id*. at 569.

The instant case bears little resemblance to *Blanton*.  First, the record indicates that by

the time the trusteeship was imposed, at the latest, Local 715 not only had become "more or less

inactive" but had been stripped of every function characteristic of a labor organization.  Second,

the statements by former Local 715 personnel that the union had ceased to exist were repeated

on multiple occasions and in multiple contexts, and in fact are fully consistent with the other

evidence of the union's dissolution that is now before this Court.  Third, in contrast to the union

in *Blanton*, Local 715 effectively *was* dissolved when the International President of SEIU

ordered that it and several other unions "be, *and are hereby*, reorganized into SEIU Local

UHW."  Order of Reorganization, Inciardi Decl., Ex. U (emphasis added).  Finally, in contrast to

the obstructionist tactics employed by the company in *Blanton*, the Hospitals repeatedly sought

to clarify the status of Local 715 so that they could meet their procedural obligations under the

CBA.  Indeed, Local 715's evasive position on the issue necessitated the filing of unfair labor

practice charges to compel the production of information concerning the status of Local 715.

### 2. Existence as a prerequisite of bargaining authority

Even if the Court were to accept the trustee's conclusory declarations as competent

evidence that Local 715 currently represents *some* employees, Local 715 has failed to show a

triable issue of fact with respect to whether it *continued to exist* at the time the conduct at issue

in five of the six grievances occurred.  It is well-established that events which alter a bargaining

entity's status, including termination and decertification, "do not destroy the right to redress

arising under and relating to a valid preexisting contract," such that when the union "was the

authorized representative [at the time], [it later may] properly act[] in that limited role."  *Int'l

Union, United Auto., Aerospace and Agr. Implement Workers of Am. and its Amalgamated

Local Union No. 1369 v. Telex Computer Prods., Inc.*, 816 F.2d 519, 523 (10th Cir. 1987)

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1    (citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964)).   However, a local union's

2    transfer of its representational status to another local constitutes a disclaimer of interest.   *See,*

3    *e.g.*, *Sisters of Mercy Health Corp.*, 277 NLRB 1353, 1354 (1985); *Teamsters Local 595*

4    *(Sweetener Products)*, 268 NLRB 1106, 1111 n. 11 (1984).   After making such a disclaimer, the

5    original local "*[cannot] thereafter resurrect its bargaining status*."   *Sisters of Mercy*, 277

6    NLRB at 1354 (emphasis added).

7        In the instant case, because five of the six subject grievances arose after March 1, 2007,

8    when Local 715 allegedly ceased to exist, Local 715 must demonstrate at least a triable issue of

9    fact with respect to its continued existence after that date.[4]   Despite all of the evidence that Local

10   715 ceased to exist on or around March 1, 2007–inter alia, the statements of its purported

11   members and employees, SEIU's implementation of the reorganization plan, the dismantling of

12   Local 715's website, and the transfer of its assets, records, and members to other locals–the sole

13   "evidence" of the local's continued existence at that time is the unsupported assertion by the

14   later-appointed trustee that Local 715 had several thousand members when the trusteeship was

15   imposed on June 8, 2007.   This imprecise and unsupported assertion is no more capable of

16   defeating summary judgment than the equally unsupported assertions in the Smith Declaration

17   that the Court already has rejected.   *National Steel Corp.*, 121 F.3d at 502.   Rather, the record

18   supports the Hospitals' claim that "[a]fter March 1, 2007, [no one] remotely associated with

19   'Local 715' took any action or played any role whatsoever in connection with representation of

20   the [Stanford] Unit."   Hospitals' Reply ISO MSJ, Case No. C. 07-5158 JF, at 9:4-7 (citing Smith

21   Depo., 205:8-14; Sermersheim Depo., 302:12-305:2; Quintel Decl., ¶ 5).

22        Nor could the trusteeship preserve Local 715's status if Local 715 ceased to exist on or

23   about March 1, 2007.   A trusteeship may be imposed only upon a "subordinate body" of a parent

24   union.   *See* 29 U.S.C. § 462.   If "the local disappears[,] there is nothing to impose a trusteeship

---

[4] The Anesthesia Techs dispute arose well before the alleged extinction of Local 715.
Accordingly, the purported Local 715 need only show that it currently exists in some form to
demonstrate its standing.

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1  on . . . .  The local is no longer a subordinate body of the international; it is no sort of body; it is

2  nothing." *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers,*

3  *AFL-CIO v. Local Lodge 714, Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths,*

4  *Forgers, and Helpers*, AFL-CIO, 845 F.2d 687, 692 (7th Cir. 1988); *accord Flight Eng'rs Int'l*

5  *Ass'n v. Continental Air Lines, Inc.*, 297 F.2d 397, 402-03 (9th Cir. 1961).  Thus, the record

6  supports the conclusion that as of March 1, 2007, the Hospitals legitimately "could refuse to

7  recognize [the original local] as the unit employees' representatives and [that] [the original

8  local] could not thereafter resurrect its bargaining status" by imposition of a trusteeship.  *Sisters*

9  *of Mercy*, 277 NLRB at 1354.

### IV. CONCLUSION

11  In light of the foregoing, the Court concludes that there is no genuine dispute as to any

12  material fact that could demonstrate that Local 715 exists for standing purposes, or that it

13  existed at the time that a majority of the grievances arose.  Recognizing that this conclusion may

14  well impair the rights of the workers who looked to Local 715 for representation, the Court

15  reaches it with great reluctance.  Yet the record leaves at most a metaphysical doubt as to the

16  existence of Local 715, and such a doubt is insufficient to defeat summary judgment.  *Johnson*

17  *v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007).  At the same time, the Hospitals' success in

18  demonstrating the non-existence of Local 715 prevents the Court from granting all of the relief

19  that the Hospitals seek.  Because "the sole plaintiff . . . no longer exists[,] . . . . this . . . case is

20  now moot."  *Continental Air Lines, Inc.*, 297 F.2d at 403.  Accordingly, the Court may not reach

21  any further arguments or grant either party's motions, and each of the six actions must be

22  dismissed.

24  **IT IS SO ORDERED.**

25  DATED: 3/11/09

27  _____
   JEREMY FOGEL
   United States District Judge

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)

1  This order has been served electronically upon the following persons:

2  Bruce A. Harland      courtnotices@unioncounsel.net, bharland@unioncounsel.net

3  Eileen Regina Ridley      eridley@foley.com, tschuman@foley.com, wdelvalle@foley.com

4  Laurence R. Arnold      larnold@foley.com

5  Scott Powers Inciardi      sinciardi@foley.com, kkunisaki@foley.com, syardley@foley.com

6  Vincent A. Harrington , Jr      courtnotices@unioncounsel.net

7  W. Daniel Boone      courtnotices@unioncounsel.net

8  William A. Sokol      courtnotices@unioncounsel.net

9  This order has been served by other means upon the following persons:

10

11  William Daniel Boone
    Weinberg Roger & Rosenfeld
    1001 Marina Village Pkwy
12  Suite 200
    Alameda, CA 94501-1091

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case Nos. C 07-5158 JF (RS), C 08-213 JF (RS), C 08-215 JF (RS), C 08-216 JF (RS), C 08-1726 JF (RS), C 08-1727 JF (RS)
ORDER DISMISSING ACTIONS
(JFLC3)